I certify this to be a true and accurate copy of the
official documents as filed in the records of the Ohio
Environmental Protection Agency.

By: _M. A. Shapiro_   In the Matter of: Date: _2/7/2017_

**BEFORE THE**

## OHIO ENVIRONMENTAL PROTECTION AGENCY

In the Matter of:

Rover Pipeline, LLC                          :
3738 Oak Lawn Ave.                       :          **Director's Final**
Dallas, TX 75225                            :          **Findings and Orders**
                                                     :

**Respondent**

### I. JURISDICTION

These Director's Final Findings and Orders ("Orders") are issued to Rover Pipeline, LLC ("Respondent"), pursuant to the authority vested in the Director of the Ohio Environmental Protection Agency ("Ohio EPA") under Ohio Revised Code ("ORC") §§ 6111.03, 3704.03 and 3745.01.

### II. PARTIES BOUND

These Orders shall apply to and bind Respondent and successors in interest liable under Ohio law. No change in ownership of Respondent shall in any way alter Respondent's obligations under these Orders.

### III. DEFINITIONS

Unless otherwise stated, all terms used in these Orders shall have the same meaning as defined in ORC Chapters 6111 and 3704 and the rules promulgated thereunder.

### IV. FINDINGS

The Director of Ohio EPA has determined the following findings:

1.  Respondent is a person, as defined by ORC 3704.01 and ORC 6111.01 and owns and operates horizontal directional drilling operations in numerous counties throughout Ohio.

#### Cooperative Federalism:  the Relationship between Relevant Federal and State Law

2.  Ohio EPA, through delegation of U.S. EPA, implements the federal National Pollutant Discharge Elimination System (NPDES) permitting program in the State of Ohio.



**EXHIBIT**

C

3.  Ohio EPA, pursuant to congressional mandate, adopts water quality standards for the State of Ohio that are approved by U.S. EPA pursuant to 33 U.S.C § 1313. Ohio EPA also issues water quality certifications for federal permits that propose a discharge into federally regulated waters, providing that the proposed discharge will comply with the state's water quality standards.

4.  That federal Water Pollution Control Act (Clean Water Act) states that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources * * *." 33 U.S.C. § 1251(b).

5.  That Act preserves the states' authority by confirming that "nothing * * * shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution * * *." 33 U.S.C. §1370.

6.  This Act shall not "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370.

7.  Consistent with the federal Act, Ohio has enacted laws and adopted rules to protect water quality by prohibiting actions and mandating requirements that are above and beyond requirements found in the federal Act.

8.  The federal Clean Air Act provides that "[a]ir pollution control at its source is the primary responsibility for State and local governments." 42 U.S.C. § 7401(a)(3).

9.  The United States Environmental Protection Agency ("U.S. EPA") promulgates national ambient air quality standards for certain pollutants, and each state must develop a state implementation plan, for U.S. EPA's approval, that provides for the implementation, maintenance and enforcement of these air quality standards. 42 U.S.C. §§ 7409, 7410(a)(1), (k).

10. Upon the approval of U.S. EPA, the state implementation plan becomes federally enforceable. 42 U.S.C. §§ 7413(a)(1).

11. The Clean Air Act also reserves to the states the authority to enforce state air pollution standards or requirements in a state implementation plan or standards or limitations at least as stringent as the state implementation plan. 42 U.S.C. §§ 7416, 7604(e).

12. The State of Ohio has regulated with an approved state implementation plan since at least 1976, and the plan has been published in the federal register since at least 1978 (43 Fed. Reg. 4611 (February 3, 1978)).

13. Ohio's State Implementation Plan incorporated Ohio EPA's open burning rules, including but not limited to—Ohio Adm.Code (OAC) 3745-19-01; OAC 3745-19-04; and OAC 3745-19-05—as enforceable conditions.

14. Federal law, specifically the federal Natural Gas Act (NGA), regulates "the transportation of natural gas in interstate commerce." 15 U.S.C. § 717(b). However, the NGA does not supersede federal environmental laws and must yield to any state right reserved under the Clean Air Act, 42 U.S.C. § 7401, *et seq*, or the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*, also known as the Clean Water Act, to ensure that the construction of an interstate natural gas pipeline complies with those federal environmental laws. 15 U.S.C. § 717b(d).

## Inadvertent Returns

### Inadvertent Return 1704-79-0701

15. While conducting horizontal directional drilling activities on April 8, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return (IR) of approximately 1,000 gallons of bentonite slurry in a wetland area near the crossing of Indian Fork River, near Dawn and Miller Hill Roads, Warren Township, Tuscarawas County (lat. 40 31.06" N/ long. 81 17.173" W).

16. The release was located approximately 100 yards west of an operating directional boring rig. The drilling fluids accumulated within an estimated 2,500 square foot area of the wetland.

17. Ohio EPA Emergency Response arrived on site and observed drilling fluids that included bentonite and cuttings from the natural formation coating the area with a layer of mud that impacted water quality. Respondent had installed silt fence and straw bales as containment around the release location.

18. The wetland area near the crossing of Indian Fork River is a water of the state as that term is defined in ORC § 6111.01.

### Inadvertent Return 1704-07-0711

19. While conducting horizontal directional drilling activities on April 10, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return of approximately 600 gallons of bentonite slurry. The drilling fluids entered into an

> unnamed stream, wetland, and pond in Richland Township, Belmont County (lat. 40.03.59.9 N/ long. 80.58.36.4 W).

20. The unnamed stream, wetland, and pond are waters of the state as that term is defined in ORC § 6111.01.

### Inadvertent Return 1704-76-0751

21. While conducting horizontal directional drilling activities on April 13, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return that Ohio EPA later determined to be several million gallons of bentonite slurry. The break out point for the drilling fluids was located within a Category 3 wetland adjacent to the Tuscarawas River in Navarre Township, Stark County (lat. 40.40 270 N/ long. 81.29 098 W)(the "Stark County Site.")

22. The drilling fluids accumulated within an area estimated to be 6.5 acres in size. Drilling fluids that included bentonite and cuttings from the natural formation coated the area with a layer of mud and affected water quality.

23. The wetland area near the Tuscarawas River is a water of the state as that term is defined in ORC § 6111.01.

24. Additional inadvertent returns continue to occur at this Site, as set forth in a Notice of Violation letter dated May 25, 2017 issued to Respondent. As of the May 18, 2017 inspection, Ohio EPA inspectors observed that the cleanup of the initial release that occurred on April 13, 2017 was ongoing and incomplete.

25. In the course of investigating these inadvertent return, Ohio EPA received two complaints of diesel fuel being added to the drilling mud at this Site. Ohio EPA conducted two separate sampling initiatives on May 12, 2017 and May 19, 2017. The May 12th results indicated the presence of "Diesel Range Organics" ("DRO") in all 5 samples. Based on the DRO data, supplemental sampling was initiated on May 19th to determine the presence of petroleum hydrocarbons. Petroleum hydrocarbons were found in 6 of 7 samples, with only the sample of new mud showing no traces of hydrocarbons. Ohio EPA continues to investigate the allegations within the two complaints.

26. Spent drilling fluids containing refined oil-based substances, including diesel fuel, or any other commercially produced additives, are defined as "industrial waste" under ORC Chapter 6111 and must be disposed of at a licensed municipal solid waste landfill or other location authorized by Ohio EPA.

### Inadvertent Return 1704-70-0756

27. While conducting horizontal directional drilling activities on April 14, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return of approximately 50,000 gallons of bentonite slurry during a pilot hole drilling operation. The breakout point for the drilling fluid entered a wetland near Amoy Pavonia Road, Mifflin Township, Richland County (lat. 40.49.759 N long 82.25.071 W), and affected water quality.

28. The wetland is a water of the state as that term is defined in ORC § 6111.01

### Inadvertent Return 1704-34-0777

29. While conducting horizontal directional drilling activities on April 17, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return of approximately 200 gallons of bentonite slurry while drilling. The breakout point surfaced on a pond located at Highway 151 and Caldwell Road, Monroe Township, Harrison County, and affected water quality.

30. The pond is a water of the state as that term is defined in ORC § 6111.01.

### Inadvertent Return 1704-85-0827

31. While conducting horizontal directional drilling activities on April 22, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return of approximately 200 gallons of bentonite slurry while drilling. The breakout point for the drilling fluid entered an unnamed ditch located at 4489 Prairie Lane Road, Wooster Township, Wayne County, and affected water quality.

32. The unnamed ditch is a water of the state as that term is defined in ORC § 6111.01.

### Inadvertent Return 1704-34-0972

33. While conducting horizontal drilling activities on May 8, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return of approximately 10,000 gallons of bentonite slurry during the installation of a natural gas pipeline. The breakout point for the drilling fluids surfaced in a pond and a stream in Monroe Township, Harrison County, and affected water quality.

34. The pond and stream are waters of the state as that term is defined in ORC § 6111.01.

### Inadvertent Return 1707-EPA-0477

35. While conducting horizontal drilling activities on July 2, 2017, Respondent discovered and reported to Ohio EPA an inadvertent return of approximately 5,000 gallons of drill slurry within the already impacted area of the Stark County Site where remediation work is ongoing. The IR occurred in two breakout locations during the horizontal direction drilling of a 60-inch borehole under the Tuscarawas River for the installation of a 42-inch natural gas pipeline.

### Inadvertent Return 1707-EPA-0486

36. While on scene for Incident 1707EPA0477, a new IR occurred on July 3, 2017, outside of the containment area and within ten feet of the river bank of the Tuscarawas river. The IR accumulated in a trough that ran parallel to the river. Initial volume was estimated between 1500-2500 gallons of bentonite slurry was released. Additional personnel, materials and equipment to expand the containment and recovery operations were brought in and drilling was suspended. Ohio EPA recommended to Respondent that they prepare for and have equipment on site for potential release to the waterway which would entail using boats or other platforms to both observe and respond to a release.

## Contingency Plan

37. In an effort to better respond to inadvertent returns, Respondent submitted a revised Release Prevention and Emergency Response Contingency Plan ("Contingency Plan") on April 29, 2017 that identified measures to protect public health and the environment from these events. Ohio EPA provided recommendations to Respondent in a letter dated May 3, 2017. On May 5, 2017, Respondent submitted a revised Contingency Plan incorporating some but not all of Ohio EPA's comments and recommendations.

38. In a letter dated July 7, 2017, Ohio EPA provided further comments on the Contingency Plan with a specific focus on addressing potential inadvertent returns to larger water bodies such as the Tuscarawas River.

## Storm Water Violations

39. On April 5, 2017 and again on April 10, 2017, while Respondent was constructing the Rover Pipeline in Monroe County, Ohio EPA staff observed storm water run-off containing sediment and turbid discharges related to trench dewatering entered un-named tributaries to Woodsfield Reservoir and impacts to the reservoir itself.

40.    On April 11, 2017, while Respondent was constructing the Rover Pipeline in Wood, Richland and Crawford Counties, Ohio EPA staff noted excessive vehicle tracking of mud onto public roads from the active construction of Rover Pipeline.

41.    On April 11, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed discharges of sediment laden water from a filter bag designed specifically to treat contaminated storm water. The treatment system and associated discharges were noted in Wood County near the intersection of Pelton Road and Portage View Road, Bloomdale, Ohio.

42.    On April 12, 2017, while Respondent conducted trench dewatering activities in Wood County, southeast of the Village of Cygnet (lat. 41° 13'19" N/ long. 83° 35' 43" W), Ohio EPA staff observed turbid discharges to Bull Creek at Tank Farm Road.

43.    On May 2, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed discharges of sediment laden water from a filter bag designed specifically to treat contaminated storm water. The treatment system and associated discharges were noted in Wood County near the intersection of Pelton Road and Portage View Road, Bloomdale, Ohio.

44.    On May 3, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed Respondent conducting trench de-watering activities which resulted in turbid discharges directly into Brushy Fork Creek in the location of 77960 Slater Road in Cadiz, Ohio.

45.    On May 4, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA observed dewatering bags with operating pumps discharging sediment to waters of the state on Cloverdale Road, north of Oil Center Road, Wood County.

46.    On May 4, 2017, while Respondent was constructing the Rover Pipeline in Belmont County, Ohio EPA staff observed storm water run-off containing sediment entered an unnamed tributary to Pea Vine Creek. Ohio EPA noted impacts to the stream bottom and streambanks of the unnamed tributary.

47.    On May 5, 2017, while Respondent was constructing the Rover Pipeline, Respondent conducted dewatering activities which resulted in turbid discharges to waters of the state near the Village of Cadiz, Harrison County.

48.    On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA observed sediment laden storm water discharges entering waters of the state southwest of the intersection of County Road 2 and County Road H, Henry County.

49.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA observed sediment laden storm water discharges entering waters of the state at County Road 11, south of County Road J, Harrison County.

50.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed storm water run-off containing sediment entering an unnamed tributary of Sandy Creek and Wetland W3H-TU-223 at Access 15- Sandyville Road in Sandy Township, Tuscarawas County.

51.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed storm water run-off containing sediment entering Huff Run and Wetland W8H-TU-225 at Access 12- Lindentree Road in Sandy Township, Tuscarawas County.

52.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed storm water run-off containing sediment entering Wetland W4ES-TU-217, at Access 6- Dawn Road in Warren Township, Tuscarawas County.

53.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed the placement of dewatering bags and the deposition of sediment from dewatering activities within Wetland W4ES-TU-217, which was to be avoided.

54.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed dewatering bags with operating pumps discharging sediment to the wetland and an unnamed tributary of Conotton Creek at Access 6- Dawn Road in Warren Township, Tuscarawas County.

55.   On May 5, 2017, while Respondent was constructing the Rover Pipeline, Ohio EPA staff observed a dewatering bag placed near an unnamed tributary to Conotton Creek to dewater groundwater. The discharge from the dewatering bag was rust colored, causing discoloration of the receiving waterbody.

56.   On May 8, 2017, while Respondent was constructing the Rover Pipeline in Tuscarawas County, storm water run-off containing sediment entered an unnamed tributary to Sandy Creek. Ohio EPA noted impacts to the stream bottom and streambanks of the unnamed tributary.

57.   Pursuant to 33 U.S.C. §1342(l)(2) of the Clean Water Act and 40 C.F.R. 122.26(c)(1)(iii), Respondent is required to obtain a NPDES permit for storm water runoff from construction activities, if the storm water runoff is contaminated by contact with any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of oil and gas exploration, or contributes to a water quality standard violation.

58. ORC 6111.03(J)(1) provides that the Director may issue permits in compliance with all requirements of the Federal Water Pollution Control Act and mandatory regulations adopted thereunder. That section further provides that permit terms and conditions set by the Director shall be designed to achieve and maintain full compliance with mandatory requirements of the Federal Water Pollution Control Act that are imposed by regulation of the Administrator of the United States Environmental Protection Agency. Pursuant to 40 C.F.R. 122.26 and Ohio Administrative Code Rule (OAC) 3745-39-04, dischargers of storm water associated with construction activity that disturbs more than one (1) acre of land to obtain an individual NPDES permit or coverage under a storm water general permit.

59. Because Respondent disturbed more than one (1) acre of land and because Respondent has repeatedly caused water quality standards to be violated based on its construction activities, Respondent was required to obtain a construction storm water individual NPDES permit or submit a Notice of Intent ("NOI") to obtain coverage under Ohio's NPDES Construction Storm Water General Permit and to develop and implement a Storm Water Pollution Prevention Plan ("SWP3"). Respondent's failure to obtain a permit is a violation of OAC 3745-39-04 and ORC 6111.07.

### 401 Violations

60. Ohio EPA received a complete 401 water quality certification application for the Rover Pipeline Project from Respondent on August 9, 2016.

61. The 401 certification was issued to Respondent on February 24, 2017.

62. Respondent commenced construction activities requiring the 401 certification on/or around February 24, 2017.

63. Ohio Administrative Code ("OAC") Rule 3745-32-02(B) states that no person shall engage in an activity requiring a 401 certification prior to obtaining that certification from Ohio EPA.

64. OAC Rule 3745-32-02(C) states that no 401 certification issued pursuant to this chapter shall be effective until all applicable fees have been paid.

65. An invoice was sent to Respondent on February 24, 2017, with a due date of March 26, 2017. Payment was not received until May 15, 2017. Respondent's dredge and fill activities occurring before May 15, 2017 were in violation of OAC Rule 3745-32-02(B) and (C) and ORC 6111.07.

## Industrial Waste Disposal Violation

66.   Respondent has deposited spent drilling mud containing diesel fuel residuals at the Oster Sand and Gravel Disposal Pit located near the City of Massillon's public water system's drinking water intake and the Beach City Quarry located in proximity to the City of Canton's Sugarcreek drinking water wellfield ("Sugarcreek Wellfield").

67.   Pursuant to ORC § 6111.45, no corporation, or officer or employee thereof or other person shall establish any industrial establishment, process, trade, or business in the operation of which an industrial waste is produced, or make a change in or enlargement of any industrial establishment, process, trade, or business whereby an industrial waste is produced or materially increased or changed in character, or install works for the treatment or disposal of any such waste until the plans for the disposal of the waste have been submitted to and approved by the director of environmental protection. "Industrial waste" means sludge or sludge materials or a water-carried or liquid waste resulting from any process of industry, manufacture, trade, or business or development of any natural resource.

68.   Spent drilling mud containing diesel fuel residuals and/or petroleum hydrocarbons is an "industrial waste".

69.   Respondent's disposal of industrial waste without a plan approved by the Director violates ORC § 6111.45.

## Unauthorized Discharges and Water Quality Violations

70.   Pursuant to ORC § 6111.04, no person shall place or discharge, or cause to be placed or discharged, in any waters of the state any sewage, sludge, sludge materials, industrial waste, or other wastes without a valid, unexpired permit.

71.   Pursuant to ORC § 6111.07(A), no person shall violate or fail to perform any duty imposed by ORC §§ 6111.01 to 6111.08 or violate any order, rule, or term or condition of a permit issued or adopted by the Director of Ohio EPA pursuant to those sections. Each day of violation is a separate offense.

72.   OAC Rule 3745-1-04 provides, in part, that the following general water quality criteria shall apply to all surface waters of the state including mixing zones: To every extent practical and possible as determined by the Director, these waters shall be: (A) Free from suspended solids or other substances that enter the waters as a result of human activity and that will settle to form putrescent or otherwise objectionable sludge deposits, or that will adversely affect aquatic life; and (C) Free

from materials entering the waters as a result of human activity producing color, odor or other conditions in such a degree as to create a nuisance.

73. OAC Rule 3745-1-51 provides, in part, that in addition to the criteria listed in OAC 3745-1-04, the following narrative criteria shall apply to wetlands: (A) Hydrology necessary to support the biological and physical characteristics naturally present in wetlands shall be protected to prevent significant adverse impacts on: (1) water currents, erosion, or sedimentation patterns; (3) Chemical, nutrient, and dissolved oxygen regimes of the wetland; (4) The movement of aquatic fauna; and (6) water levels or elevations, including those resulting from ground water recharge and discharge; (B) water quality necessary to support existing habitats of wetland flora and fauna, including food supplies for fish and wildlife and reproductive and nursery areas; and (C) conditions shall not occur that will have a significant adverse impact on the ability of the wetland to be used for wetland-dependent recreational opportunities in or on the water.

74. Respondent discharged pollutants, as detailed in Findings 15-36 from point sources into waters of the state without obtaining an Ohio NPDES permit or Section 401 water quality certification or obtaining authorization to discharge under a general NPDES or Section 401 nationwide permit, in violation of ORC §§ 6111.04 and 6111.07, and OAC Rules 3745-33-02(A), 3745-38-02(A), and 3745-32-02(B).

75. Respondent's discharges violated OAC Rule 3745-1-04(A) by depositing substances into waters of the state and adjacent wetlands as a result of human activity that settled to form objectionable sludge deposits and that adversely affected aquatic life.

76. Respondent's discharges violated OAC Rule 3745-1-04(C) by discharging substances into waters of the state and adjacent wetland as a result of human activity that altered the natural color or other conditions of waters of the state and adjacent wetland in such a degree as to create a nuisance.

77. Respondent's discharges violated OAC Rule 3745-1-51(A) by causing significant adverse impacts on the waters of the state and adjacent wetland's sedimentation patterns, dissolved oxygen regimes, movement of fauna, water elevations, and adverse impacts to food supplies for fish and wildlife.

78. Compliance with ORC Chapter 6111 is not contingent upon the availability or receipt of financial assistance.

79. The Director has given consideration to, and based his determination on, evidence relating to the technical feasibility and economic reasonableness of complying with these Orders and to evidence relating to conditions calculated to result from compliance with these Orders, and its relation to the benefits to the people of the

State to be derived from such compliance in accomplishing the purposes of ORC Chapter 6111.

## Open Burning Violation

80. OAC Rule 3745-19-04(A) prohibits any person or property owner from allowing or causing open burning, as defined in OAC Rule 3745-19-01(K), in an unrestricted area except as allowed by rule or law.

81. OAC Rule 3745-19-04(C)(4) allows, after written permission from Ohio EPA, open burning of land clearing waste disposal provided that certain conditions are observed. These conditions include, but are not limited to, a requirement that the fire be located at a point no less than one thousand feet from any inhabited building not located on the premises where the open burning is to occur.

82. ORC § 3704.05(G) states, in part, that no person shall violate any order, rule, or determination of the Director issued, adopted, or made under ORC Chapter 3704. OAC Chapter 3745-19 was adopted by the Director pursuant to ORC Chapter 3704.

83. Pursuant OAC Rule 3745-19-04(C)(4), on March 13, 2017, Ohio EPA received a written application for permission to open burn from Excel Mulching. The application requested permission to use open burning as the method of disposing land clearing waste generated by the installation of the Burgettstown Lateral pipelines which are part of the Rover Pipeline Project. Specifically, Excel Mulching requested to open burn at 49 sites along the pipeline in Jefferson County, Ohio. The 49 sites are located in unrestricted areas as defined in OAC Rule 3745-19-01(N).

84. On March 29, 2017, Ohio EPA granted permission to open burn the land clearing waste material at the 49 sites provided that Excel Mulching complied with the written permission and OAC Rule 3745-19-04(C). This included the requirement that all fire sites be at least one thousand feet from any inhabited building.

85. On April 11, 2017, Ohio EPA received a complaint regarding open burning being conducted on the pipeline's right of way, near Township Road 240, Toronto, Ohio. An investigated conducted by Ohio EPA on April 12, 2017, revealed that the open burning fire site was located within thousand feet of an inhabited building, in violation of the March 29, 2017 written permission, OAC Rule 3745-19-04(C)(4)(c) and ORC § 3704.05(G).

86. As part of the construction project, Respondent contracted with Excel Mulching to open burn the land cleaning waste generated as part of the pipeline construction and therefore, caused or allowed the illegal open burning incident which occurred on or around April 11, 2017.

87. OAC Rule 3745-19-05(A)(5) states that a violation of a condition set forth by Ohio EPA in granting permission to open burn may be grounds for revocation of such permission and refusal to grant future permission, as well as for the imposition of other sanctions provided by law. This includes the assessment of civil penalties.

88. Based on the above Findings, the Director of Ohio EPA finds that Respondent allowed burning within a thousand feet of an inhabited building, in violation of OAC Rule 3745-19-05(A) and ORC § 3704.05(G).

## V. ORDERS

1. Respondent shall immediately implement the Release Prevention and Emergency Response Contingency Plan ("Contingency Plan") that identifies measures to protect public health and the environment, that was submitted for review on May 5, 2017. Within seven days of the effective date of these Orders, Respondent shall submit a revised Contingency Plan addressing comments provided in Ohio EPA's letter of July 7, 2017 for Ohio EPA's review and approval.

2. Within seven (7) days of Ohio EPA's approval of the Contingency Plan, Respondent shall discontinue using the initial plan submitted and implement the approved Contingency Plan.

3. Within seven (7) days from the effective date of these Orders, Respondent shall submit a plan for approval to the Ohio EPA pursuant to the requirements of ORC 6111.45 for the removal of all spent drilling mud that was deposited into the Oster Sand and Gravel Disposal Pit and the Beach City Quarry and dispose of it in accordance with the plan approved by the Director of Ohio EPA.

4. Within seven (7) days from the effective date of these Orders, Respondent shall submit a plan for approval to the Ohio EPA pursuant to the requirements of ORC 6111.45 for the proper disposal of spent drilling mud contaminated with petroleum hydrocarbons that was deposited into the Category 3 wetland adjacent to the Tuscarawas River as described in Findings 21 through 26 above.

5. Within fourteen (14) days from the effective date of these Orders, Respondent shall submit a sampling plan to Ohio EPA for approval, to determine the presence of diesel range organics and petroleum hydrocarbons in drilling mud utilized throughout HDD projects in Ohio. If the sample results indicate the presence of these constituents, Respondent shall manage the drilling fluid from these sites in accordance with the requirements of ORC 6111.45.

6. Within thirty (30) days from the effective date of these Orders, Respondent shall submit to Ohio EPA, 401/Wetland/Environmental Mitigation Section, for review and

approval, a Wetland Restoration Plan ("WRP") for the restoration of the impacted acres of Category 3 wetland outlined in the above listed Findings. In addition to the restoration, Respondent shall include in the WRP, the mitigation of an additional 19.5 acres of Category 3 wetland to be preserved, enhanced, or restored either onsite or offsite.

7.  Ohio EPA will review the WRP and may establish additional requirements to the WRP if the plan is deemed deficient. After review of the plan, Ohio EPA may approve the plan as submitted, or approve the plan with additional conditions. Upon the approval of the WRP by Ohio EPA, Respondent shall implement the plan and complete all necessary remediation requirements required by the plan within six (6) months from the date Ohio EPA approves the WRP or an alternate deadline approved by Ohio EPA.

8.  Within seven (7) days from the effective date of these orders, Respondent shall submit a NOI to obtain coverage under Ohio's NPDES Construction Storm Water General Permit and a Construction Storm Water Pollution Prevention Plan ("SWP3") consistent with Ohio's General NPDES Construction Storm Water Permit No. OHC00004 for Ohio EPA's approval. Upon approval, Respondent shall implement the SWP3 and it shall become an enforceable part of these Orders.

## Ground Water Monitoring Program – Stark County Spill Site

9.  Respondent shall implement and conduct a ground water monitoring program to determine the impact of the inadvertent return of bentonite drilling mud and constituents at the Stark County Site on ground water quality in the area of the inadvertent returns, residential wells, and ground water monitoring wells in accordance with the requirements and timeframes set forth in these Orders. The ground water monitoring program as conducted per these Orders shall be in accordance with Ohio EPA's Technical Guidance Manual for Hydrogeologic Investigation and Ground Water Monitoring and shall produce analytical results that are representative of the quality of ground water in the area of the inadvertent return.

10. Within fifteen (15) days from the effective date of these Orders, Respondent shall submit a ground water sampling and analysis plan ("Stark County Plan") for sampling ground water monitoring wells and residential wells. The Stark County Plan shall include a detailed description of techniques for well purging, extraction of the sample, sample preservation, chain of custody, sample transport and analysis. Residential samples shall be collected prior to any home treatment system if reasonably accessible. The Stark County Plan shall require that samples be analyzed for the following constituents: volatile organic compounds using USEPA method 8260, semi-volatile organic compounds using USEPA method 8270 and diesel fuel compounds

using USEPA method 8015c. The Stark County Plan shall also include procedures for determining pH, temperature, specific conductance and turbidity in the field during sampling.

11. Within thirty (30) days from the effective date of these Orders, Respondent shall sample three residential wells at: 9980 Riverland Ave.; 9834 Riverland Ave.; and 9236 Riverland Ave. Samples shall be collected following the procedures included in the Stark County Plan submitted pursuant to Order 10.

12. Within sixty (60) days from the effective date of these Orders, Respondent shall install, and develop monitoring wells located approximately in the four locations indicated on Figure 1. The Director may approve alternative locations and require additional monitoring well locations. Two monitoring wells shall be installed at each location. All monitoring wells shall be constructed with a screen length of 10 feet. The screen of the deepest well shall be at a depth consistent with the depth of the pipeline boring beneath the Tuscarawas River. The shallow well shall have a screen interval consistent with the water table.

13. Within sixty (60) days from the effective date of these Orders, Respondent shall sample the monitoring wells installed per Order 12 using the Stark County Plan submitted pursuant to Order 10.

14. Respondent shall submit all analysis results to Ohio EPA within thirty (30) days from the date any well was sampled pursuant to these Orders.

15. Respondent shall submit with the first analytical results for ground water samples from the monitoring wells sampled, a report describing the construction of the monitoring wells installed per Order 12. This report shall include stratigraphic boring logs and construction logs for the monitoring wells. The report shall include locational information with accuracy of one meter in both latitude and longitude. The report shall include the elevation relative to mean sea level of the top of casing to a surveyed mark with an accuracy to within one hundredth of a foot. All locational and elevation data shall be certified by a Registered Surveyor with the State of Ohio.

16. The residential wells and monitoring wells required to be sampled under these Orders shall be sampled every ninety (90) days after the first sampling events required pursuant to Orders 11 and 13 for a total of four sampling events during the first year after the effective date of these Orders. All residential and monitoring wells may be sampled during the same sampling event beginning ninety (90) days after first sampling the monitoring wells. After the first year of sampling the residential well and monitoring wells required to be sampled per these orders shall be sampled every 180 days for two years. The Director may extend the monitoring period and change the frequency of sampling.

17. All documents submitted to Ohio EPA under these orders shall contain the notarized signature of a qualified ground water scientist and shall contain the following statement: "I certify that I am a qualified ground water scientist as defined in rule 3745-400-01 of the Administrative Code, and that I have prepared the information submitted in this document, and that to the best of my knowledge the information is true, accurate, and complete."

18. If there is any release of contamination to ground water due to activities performed by Respondent, Respondent shall perform a ground water assessment. This assessment shall include determining the concentration of contaminants in ground water, the extent of the contaminants and the rate of movement of the contaminants.

19. If sampling shows that ground water quality has been impacted by Respondent, Respondent shall perform ground water corrective measures. The Director may select from the corrective measure recommendations submitted by Respondent or the Director may require that Respondent conduct an alternative corrective measure remedy as selected by the Director.

20. If sampling shows that Respondent is contaminating a water supply well downgradient of the facility, Respondent shall provide relief to nearby residents. The relief to any affected party shall include, as necessary: connection to a public water supply (including running the water line and potential expansion of the public water system), or drilling of a new well, such that the affected party is assured a sustainable, adequate, and uncontaminated source of drinking water.

## Ground Water Monitoring of Aqua Massillon/ Oster Sand and Gravel Area

21. Respondent will implement and conduct a ground water monitoring program to determine the impact of the disposal of bentonite drilling mud and constituents, and waste soil from drilling activities at the Oster Sand and Gravel Disposal Pit on ground water quality in accordance with these Orders. The ground water monitoring program as conducted per these orders shall be in accordance with Ohio EPA's Technical Guidance Manual for Hydrogeologic Investigation and Ground Water Monitoring and shall produce analytical results that are representative of the quality of ground water in the area of the Pit.

22. Within fifteen (15) days from the effective date of these Orders, Respondent shall submit a ground water sampling and analysis plan ("Aqua Massillon Plan") for sampling ground water monitoring wells, residential wells, production wells, and water supply wells. The Aqua Massillon Plan shall include a detailed description of techniques for well purging, extraction of the sample, sample preservation, chain of

custody, sample transport and analysis. Municipal and production well samples shall be collected raw at the well head prior to treatment, and residential samples shall be collected prior to any home treatment system if reasonably assessable. The samples shall be analyzed for the following constituents: volatile organic compounds using USEPA method 8260, semi-volatile organic compounds using USEPA method 8270 and diesel fuel compounds using USEPA method 8015c. The Aqua Massillon Plan shall also include procedures for determining pH, temperature, specific conductance and turbidity in the field during sampling.

23. Within thirty (30) days from the effective date of these Orders, Respondent shall sample the well at 3241 Riverside Ave. and the four Oster Sand and Gravel Inc. production wells and Aqua Ohio Wells #5 and # 14 (See attached map). Samples shall be collected following the procedures included in the Aqua Massillon Plan submitted pursuant to Order 22.

24. Within sixty (60) days from the effective date of these Orders, Respondent shall install, and develop monitoring wells located in at least two locations between the Oster Sand and Gravel Disposal Pit and the well located at 3241 Riverside Ave. and between the Oster Sand and Gravel Disposal Pit and Aqua Ohio Well #14 as shown on the attached map. The Director may approve alternative locations and require additional monitoring well locations. Two monitoring wells shall be installed at each location. All monitoring wells shall be constructed with screen length of 10 feet. The screen of the deepest well at each location shall be at a depth consistent with the depth of the water supply well that the monitoring well is associated with. The shallow well shall have a screen interval consistent with the water table.

25. Within sixty (60) days from the effective date of these Orders, Respondent will sample the monitoring wells installed per Order 24 using the Aqua Massillon Plan submitted pursuant to Order 22.

26. All analysis results shall be submitted to Ohio EPA within thirty (30) days from the date any well was sampled pursuant to these Orders.

27. Respondent shall submit with the first analytical results for ground water samples from the monitoring wells sampled per Order 25, a report describing the construction of the monitoring wells installed per Order 24. This report shall include stratigraphic boring logs and construction logs for the monitoring wells. The report shall include locational information with an accuracy of one meter in both latitude and longitude. The report shall include the elevation relative to mean sea level of the top of casing to a surveyed mark with an accuracy to a hundredth of a foot. All locational and elevation data shall be certified by a Registered Surveyor with the State of Ohio.

28. The wells required to be sampled under Orders 23 and 25 shall be sampled every

ninety (90) days after the first sampling events required pursuant to Orders 23 and 25 for a total of four sampling events during the first year after the effective date of these Orders. After the first year of sampling the monitoring wells required to be sampled per these Orders shall be sampled every 180 days for two years. The Director may extend the monitoring period and change the frequency.

29. All documents submitted to Ohio EPA under these orders shall contain the notarized signature of a qualified ground water scientist and shall contain the following statement: "I certify that I am a qualified ground water scientist as defined in rule 3745-400-01 of the Administrative Code, and that I have prepared the information submitted in this document, and that to the best of my knowledge the information is true, accurate, and complete."

30. If there is any release of contamination to ground water due to activities performed by Respondent, Respondent shall perform a ground water assessment. This assessment shall include determining the concentration of contaminants in ground water, the extent of the contaminants and the rate of movement of the contaminants.

31. If sampling shows that ground water quality has been impacted by Respondent, Respondent shall perform ground water corrective measures. The Director may select from the corrective measure recommendations submitted by Rover or the Director may require that Respondent conduct an alternative corrective measure remedy as selected by the Director.

32. If sampling shows that the Respondent is contaminating any Aqua Massillon water supply well downgradient of the Pit, Respondent shall provide relief to Aqua Massillon. The relief to Aqua Massillon shall include, as necessary: drilling of a new drinking water well, or the siting and development of a new drinking water well field including assuming the costs for design, permitting and installation of drinking water supply wells in the new well field such that Aqua Massillon is assured a sustainable or adequate, and uncontaminated source of ground water.

## Ground Water Monitoring of City of Canton's Sugar Creek Wellfield/Beach City Quarry Area

33. Respondent will implement and conduct a ground water monitoring program to determine the impact of the disposal of bentonite drilling mud and constituents, and waste soil from drilling activities at the Beach City Quarry ("Quarry") on ground water quality in accordance with these Orders. The ground water monitoring program as conducted per these orders shall be in accordance with Ohio EPA's Technical Guidance Manual for Hydrogeologic Investigation and Ground Water Monitoring and shall produce analytical results that are representative of the quality of ground

water in the area of the Quarry.

34. Within fifteen (15) days from the effective date of these Orders, Respondent shall submit a ground water sampling and analysis plan ("Quarry Plan") for sampling ground water monitoring wells, residential wells, and municipal wells. This Quarry Plan shall include a detailed description of techniques for well purging, extraction of the sample, sample preservation, chain of custody, sample transport and analysis. Municipal well samples shall be collected raw at the well head prior to treatment, and residential samples shall be collected prior to any home treatment system if reasonably assessable. The samples shall be analyzed for the following constituents: volatile organic compounds using USEPA method 8260, semi-volatile organic compounds using USEPA method 8270 and diesel fuel compounds using USEPA method 8015c. The plan shall also include procedures for determining pH, temperature, specific conductance and turbidity in the field during sampling.

35. Within thirty (30) days from the effective date of these Orders, Respondent shall conduct sampling at: City of Canton's Sugar Creek Water Treatment Plant (WTP) Wells #2, #7 and #9; City of Canton's Sugar Creek WTP Entry Point; 5449 State Route 250 NW; 5378 State Route 212; 5342 State Route 212; 5510 State Route 212; 5364 State Route 212; 10335 Dolphin Street SW; 10321 Dolphin Street SW; 10249 Dolphin Street SW; 10431 Dolphin Street SW; and 10199 Dolphin Street SW. Samples shall be collected following the procedures included in the Quarry Plan submitted pursuant to Order 34.

36. Within sixty (60) days from the effective date of these Orders, Respondent shall install, and develop monitoring wells located in at least two locations between the Quarry and the nearest production wells for City of Canton's Sugar Creek Wellfield. The Director may approve alternative locations and require additional monitoring well locations. Two monitoring wells shall be installed at each location. All monitoring wells shall be constructed with screen length of 10 feet. The screen of the deepest well shall be at a depth consistent with the depth of the production well the monitoring well is associated with. The shallow well shall have a screen interval consistent with the water table.

37. Within sixty (60) days from the effective date of these Orders, Respondent will sample the monitoring wells installed per Order 36 using the Quarry Plan submitted per Order 34.

38. All analysis results shall be submitted to Ohio EPA within thirty (30) days from the date any well was sampled pursuant to these Orders.

39. Respondent shall submit with the first analytical results for ground water samples from the monitoring wells sampled per Order 37, a report describing the

construction of the monitoring wells installed per Order 36. This report shall include stratigraphic boring logs and construction logs for the monitoring wells. The report shall include locational information with an accuracy of one meter in both latitude and longitude. The report shall include the elevation relative to mean sea level of the top of casing to a surveyed mark with an accuracy to a hundredth of a foot. All locational and elevation data shall be certified by a Registered Surveyor with the State of Ohio.

40. The wells required to be sampled under Orders 35 and 37 shall be sampled every ninety (90) days after the first sampling events required pursuant to Orders 35 and 37 for a total of four sampling events during the first year after the effective date of these Orders. After the first year of sampling the monitoring wells required to be sampled per these Orders shall be sampled every 180 days for two years. The Director may extend the monitoring period and change the frequency.

41. All documents submitted to Ohio EPA under these orders shall contain the notarized signature of a qualified ground water scientist and shall contain the following statement: "I certify that I am a qualified ground water scientist as defined in rule 3745-400-01 of the Administrative Code, and that I have prepared the information submitted in this document, and that to the best of my knowledge the information is true, accurate, and complete."

42. If there is any release of contamination to ground water due to activities performed by Respondent, Respondent shall perform a ground water assessment. This assessment shall include determining the concentration of contaminants in ground water, the extent of the contaminants and the rate of movement of the contaminants.

43. If sampling shows that ground water quality has been impacted by Respondent, Respondent shall perform ground water corrective measures. The Director may select from the corrective measure recommendations submitted by Rover or the Director may require that Respondent conduct an alternative corrective measure remedy as selected by the Director.

44. If sampling shows that the Respondent is contaminating any of the City of Canton's Sugar Creek Wellfield water supply wells downgradient of the Quarry, Respondent shall provide relief to the City of Canton. The relief to City of Canton shall include, as necessary: drilling of a new drinking water well, or the siting and development of a new drinking water well field including assuming the costs for design, permitting and installation of drinking water supply wells in the new well field such that the City of Canton is assured a sustainable or adequate, and uncontaminated source of ground water.

45. If sampling shows that Respondent is contaminating a water supply well downgradient

of the facility, Respondent shall provide relief to nearby residents. The relief to any affected party shall include, as necessary: connection to a public water supply (including running the water line and potential expansion of the public water system), or drilling of a new well, such that the affected party is assured a sustainable, adequate, and uncontaminated source of drinking water.

## VI. TERMINATION

Respondent's obligations under these Orders shall terminate when Respondent certifies in writing and demonstrates to the satisfaction of Ohio EPA that Respondent has performed all obligations under these Orders and the Chiefs of Ohio EPA's Division of Surface Water and Division of Drinking and Ground Waters acknowledge, in writing, the termination of these Orders. If Ohio EPA does not agree that all obligations have been performed, then Ohio EPA will notify Respondent of the obligations that have not been performed, in which case Respondent shall have an opportunity to address any such deficiencies and seek termination as described above.

The certification shall contain the following attestation: "I certify that the information contained in or accompanying this certification is true, accurate and complete."

This certification shall be submitted by Respondent to Ohio EPA and shall be signed by a responsible official of Respondent. For purposes of these Orders, a responsible official is defined in OAC Rule 3745-33-03(D).

## VII. OTHER CLAIMS

Nothing in these Orders shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, partnership or corporation, not a party to these Orders, for any liability arising from, or related to activities occurring on or at the site.

## VIII. OTHER APPLICABLE LAWS

All actions required to be taken pursuant to these Orders shall be undertaken in accordance with the requirements of all applicable local, state and federal laws and regulations. These Orders do not waive or compromise the applicability and enforcement of any other statutes or regulations applicable to Respondent.

## IX. NOTICE

All documents required to be submitted by Respondent pursuant to these Orders shall be addressed to:

Ohio Environmental Protection Agency
Central Office
Division of Surface Water and/or
Division of Drinking and Ground Waters
50 W Town Street., Suite 700
Columbus, Ohio 43215
Attn: Enforcement Manager

## X. RESERVATION OF RIGHTS

Nothing contained herein shall be construed to prevent Ohio EPA from seeking legal or equitable relief to enforce the terms of these Orders or from taking other administrative, legal or equitable action as deemed appropriate and necessary, including seeking penalties against Respondent for noncompliance with these Orders and/or for the violations described herein. Nothing contained herein shall be construed to prevent Ohio EPA from exercising its lawful authority to require Respondent to perform additional activities pursuant to ORC Chapters 6109 and 6111 or any other applicable law in the future. Nothing herein shall restrict the right of Respondent to raise any administrative, legal or equitable claim or defense with respect to such further actions which Ohio EPA may seek to require of Respondent. Nothing in these Orders shall be construed to limit the authority of Ohio EPA to seek relief for violations not addressed in these Orders.

## XI. EFFECTIVE DATE

The effective date of these Orders is the date these Orders are entered into the Ohio EPA Director's journal.

## XII. APPEAL RIGHTS

Respondent is hereby notified that this action of the Director is final and may be appealed to the Environmental Review Appeals Commission pursuant to R.C. § 3745.04. The appeal must be in writing and set forth the action complained of and the grounds upon which the appeal is based. The appeal must be filed with the Commission within thirty (30) days after notice of the Director's action. The appeal must be accompanied by a filing fee of $70.00 made payable to "Ohio Treasurer Josh Mandel", which the Commission, in its discretion, may reduce if by affidavit you demonstrate that payment of the full amount of the fee would cause extreme hardship. Notice of the filing of the appeal shall be filed with the Director within three (3) days of filing with the Commission. Ohio EPA requests that a copy of the appeal be served upon the Ohio Attorney General's Office, Environmental Enforcement Section. An appeal may be filed with the Environmental Review Appeals

Commission at the following address:

Environmental Review Appeals Commission
30 E. Broad Street, 4th Floor
Columbus, Ohio 43215

**IT IS SO ORDERED:**

**Ohio Environmental Protection Agency**

Craig W. Butler, Director

7/7/2017

Date

Figure 1







**ROVER PIPELINE**

**OSTER SAND & GRAVEL DUMP SITE**

Perry Township, Stark County

Legend

● Project Sample (Residential and PWS)

○ Oster Sand & Gravel and Shelly Materials Wells (Locations Approximated)

● Proposed Well Cluster Location

 Area of Dumping (Location Approximated)